Mr. Saad's trial was marred by several fundamental errors that deprived him of his constitutional right to a fair trial. First, the Confrontation Clause violation. Second, the violation of Federal Rule of Evidence 703. And finally, the prosecutorial misconduct that occurred when the government improperly commensured on witness credibility during closing. Each of these errors require reversal, turning first to the Confrontation Clause violation. Can I just clarify one thing? If we thought there was a harmless error with respect to the Confrontation Clause, there would also be a harmless error with respect to the Evidentiary Violation, too? That's correct, Judge Barron, since the harmless error is true. And conversely, if we think there's not a harmless error, then that's true for both. That's correct. Turning first to the Confrontation Clause violation, Mr. Saad's right to confrontation was violated when Agent Hartman served as a conduit for Mr. Raines' conclusion that the electrical devices in the bar area did not cause the fire. Yet, Mr. Saad was deprived his right to test Mr. Raines' crucial conclusion via the crucible of cross-examination. The government does not contest that the statements from Mr. Raines were testimonial, nor does it argue that those statements were not offered for the truth. Rather, it only argues that a statement of Mr. Raines was not conveyed to the jury. But the government is wrong. The statements that Agent Hartman offered clearly conveyed to the jury that Mr. Raines' crucial conclusion that the electrical devices were not caused, that the fire at Snows Clam Box was not caused by an electrical means. The jury had already heard that Agent Hartman reviewed Mr. Raines' report and relied on his findings before he objected to testimony. And then when the government questioned Agent Hartman and asked whether any electrical devices in the bar area caused the fire, Agent Hartman testified that Mr. Raines ultimately looked at all of those and there was nothing there, that in and of itself was sufficient to convey Mr. Raines' conclusion to the jury. But the government did more, referring back to the electrical devices that it had just elicited from Agent Hartman that Mr. Raines had examined. And Agent Hartman said that those electrical devices did not cause the fire. What do you make of the testimony? Is it Murphy? That's correct, Investigator Murphy. Investigator Murphy. I'll just read you the passage, you tell me what the significance of it is in your view. And after having consulted with Raines, conducting your own political inspection as well as consulting with other members of the investigative team, did you come to any kind of a professional opinion as to whether or not the fire was caused by some sort of an electrical event? Yes, Murphy says. And what was that opinion? And here's his answer. Our opinion was, dash, dash, my opinion was that none of the retroactivity or events that we documented or saw was the cause of the fire. So two responses, Judge Barron. First, whether or not Investigator Murphy came to a separate conclusion goes to whether the error was harmless, not whether the violation was there. But given that he said this, why doesn't it render it harmless? So the standard for harmlessness in this context is whether there's a reasonable possibility that the evidence contributed to the verdict. The jury heard that Investigator Murphy did not possess the expertise to close out and finish the investigation. There's a reasonable possibility that the jury discredited Investigator Murphy's opinion based on that testimony as to his limitations and essentially relied on Agent Hartman's testimony. You don't have any affirmative evidence that it was an electrical fire, correct? No, Your Honor. So that's what's sort of puzzling here. All we've got is somebody with one investigator ruling it out. We have another investigator ruling it out. So at most what we've got is this idea that the jury, with all the other evidence about the lying by the defendant about his alibi story, with all the other evidence about the gasoline being found, etc., you'd have to believe that it's reasonable that the jury, with no affirmative evidence that it was an electrical fire, would have come out differently just because one of the two investigators shared the opinion of the other that it wasn't an electrical fire. That seems like a lot of speculation to conclude that the jury would come out differently. Well, Agent Hartman did testify that he had to eliminate an electrical cause of the fire in order to conclude that it was incendiary. If the electrical cause had not been eliminated, he would have been left with the fact that the fire was undetermined. But you did not even argue, as I understand it, to the jury that the electrical fire hypothesis was something that they should consider and discount Hartman's testimony. Is that correct? I believe that's correct, Judge Lynch. But there was testimony as to how the government had mishandled the investigation in terms of deciding whether it was incendiary or not, and that was definitely pressed during the closing argument. But not at this point? That's correct, Judge Lynch. All right. So now that harmless error has been raised, what is your argument here that it wasn't harmless error? First, the government's case was not overwhelming. It was, as the government stated below, entirely circumstantial. So what? So it's not a case where there's kind of the slam-dunk smoking gun evidence. I'm sorry. Cases can be overwhelming even if they're circumstantial. You agree? I understand that, Judge Lynch, and that's correct. However, the question for harmlessness is whether there's a reasonable possibility that Mr. Raines's conclusion contributed to the verdict, and the government can't sustain that burden in this case, given the crucial nature of Mr. Raines's conclusion. You refer to it as crucial, but that seems to just beg the question. I mean, it's not crucial if it wasn't. So if there's another investigator who independently says, I can rule out an electrical fire, and if the defendant never put any affirmative evidence to suggest that it would be an electrical fire, why would it be crucial that another investigator also says there's no evidence that it's an electrical fire? Because that investigator was specifically brought in to fill a gap that that original investigator could not fulfill, and the jury heard that in this case. And so it was in that position could have discredited, and there's a reasonable possibility that it discredited, Investigator Murphy's conclusion in favor of Agent Hartman's, which just conveyed Mr. Raines's conclusion as to the electrical investigation. I'd like to turn briefly to make sure that I can cover the prosecutorial misconduct that occurred during closing argument here. There were five improper passages during the closing argument. For example, the government's personal opinion that Mr. Saab was a good storyteller and that his testimony was malarkey, its statement accusing Mr. Mosley of perjury, as well as its statement and characterization of Mr. Mosley as an unmitigated liar. Under this court's precedent, that was clearly improper for the prosecutor to do. And in fact, the government's stance in this case that it was proper, it's inconsistent with stances that the United States U.S. Attorney's Office for the District of Rhode Island has previously taken. In United States v. Smith, which I would direct this court's attention to. You know what? You've reserved some time. Why don't you make the argument then? Of course. Thank you, Judge Lynch. Good morning. Donald Lockhart for the government. Unless the court has a different preference, I'd like to start with the merits of the Confrontation Clause issue and then work to our Harmless Error Argument and then address the closing statement issues. On the merits, our primary contention is that we never elicited, through Hartman's testimony, any conclusions of Wayne's. Now, to understand why that's the case, you need to focus very closely on the sequence of events surrounding the critical sidebar. Just prior to the sidebar, we asked a question of Hartman that was directed at Hartman's own knowledge of the bar area and the electrical devices in that area and as to his own opinion on that. In the course of answering that question, Hartman began to say things like, we looked at all of those and we concluded. And it's at that point that the defense attorney objects and the jury never hears the conclusion that Hartman is about to testify about. So even before the sidebar, it's apparent that we are asking Hartman a question about his own opinion. He's giving an answer about his own opinion, but he's including in the answer references to the two other people, Murphy and Waynes. So there's an objection. It's sustained. The jury never hears the response. We then go to the sidebar. We essentially get a green light at that point to elicit the testimony, elicit conclusions of Wayne's through the testimony of Hartman. But notice that the judge is very clear that if the particular conclusion that we're going to ask about was not in Wayne's report, then we're not allowed to ask about it. And there's a lot of back and forth between the two attorneys about what exactly Wayne's report covers. And you can see in this interchange the fact that the defense is adamant that the report does not cover the recessed lights above the bar. The government's attorney is a little bit less adamant that the report does. You can almost see the gears turning in the AUS mind. You know, geez, do I really want to go down this road? And then when the judge at the end of the sidebar actually says, you better not go there if it's not in Wayne's report. So there's a shot across the bow. The government's attorney goes back to the podium, resumes his direct examination, and at this point he's clearly decided not to go down this road. And so what he does is he leaves Wayne's out of the picture entirely, and he addresses two very short questions to Hartman directed at Hartman's own opinion. And if you look at those questions, they're not even general questions about did this fire have an electrical cause. The question that ultimately is put after the sidebar focuses directly on the east side of the bar. It's not even both sides of the bar. And he just asks, did you have an opinion about that? Hartman says yes. And what was your opinion? And your opinion was that it had no electrical cause. Yes. So, I mean, there's some very leading... Does he not say we? No. After the sidebar, it's you and you, the personal pronoun you. The we comes up prior to the sidebar. And remember that at that point, we actually ask a question prior to the sidebar that's directed at Hartman's own opinion. The question specifically is, and this is prior to the sidebar, were there any electrical conductors in either the first point of origin or the east side of the bar or the second point of origin on the west side that would account for the causing of the fire? That's at page 1922 of the joint appendix. So here we're asking for Hartman's opinion. Hartman, in the course of responding to that question, begins to talk about how it was really, he begins to suggest, it's a collective team effort at that point in the bar. And that's where he says, Hartman says, we looked at all those. Mr. Raines ultimately looked at those. And there was nothing that we, and at that point the defense objects, the line of inquiry is shut down. We never hear the response. Am I right, at least, that the defendant's contention is that when Hartman, I'm forgetting my name, when Hartman says yes, After the sidebar. Right. The record shows that Hartman's yes would have been predicated on Raines' report. Right, and that's where we disagree entirely because the premise of that is that somehow Hartman himself wasn't qualified to give his own opinion on that issue. But the record is clear that he was qualified. What if it's just ambiguous as to what he was doing? Because you can't rule out the possibility he was relying on Raines. No, we can't. Because if you look at the two questions, they are clearly addressed to Hartman with the you. Yeah, but the question is whether they ask him you if they know that his view is predicated on Raines' report. No, the question is whether it's predicated solely on Raines' report. What if it's partially predicated on Raines' report? So our contention is that for confrontation clause purposes, when you have a team of experts working collaboratively as a team on a given project, each of them is qualified, let's say, to give an expert opinion on the particular issue. But along the way, they collaborate, they share insights, observations, and whatnot that form their ultimate conclusions that they reach in the matter. The mere fact that they have benefited from insights of their colleagues as a team in forming their conclusions doesn't create a confrontation clause problem. In other words, we don't have to call every member of a team to satisfy the confrontation clause. The key thing is that we have a witness. But that's a fair reading of our two questions following the sidebar. Our submission is that that is a fair reading of those two questions. We trimmed our sale and we asked Hartman for his own opinion, and the record, the defense doesn't even seriously dispute that the record makes clear that Hartman is qualified. Do they object to the yes answers? No. There's no objection to the yes answers at that point? No, and that's part of our, I mean, we haven't even gotten to some of the procedural threshold issues. Did you argue them plain errors? Yes, we did, in the brief. Right. Now, the argument on preservation is a little bit complicated because we would essentially agree that the hearsay objection that came before the sidebar, maybe that preserved a general confrontation clause claim. Let's assume that it did, all right? And then we got the Rule 703 ruling and the green light. But then we decided not to go through that green light. We shifted our direct examination entirely after the sidebar, and there was no objection to that entirely. So you say in light of the sidebar and all that that happened, the only way to construe your question and that answer is that it was only a request for Hartman's view independent of Rand's. And then if they had a different view of that, they had to lodge a separate objection at that point. That is the most natural reading of it. Along the continuum, you could say, well, you know, maybe conceivably, theoretically, could the jury have seen this as the royal you? It seems unlikely. But the most absurd interpretation of all is the one which says by saying you, Hartman was referring exclusively to Raines and not an opinion that he, Hartman, held. I'm just more troubled if it was partially Raines. That's all. So, counsel, you're running out of time, and I'm a bit concerned about the closing argument made by the prosecutor. Okay. So the key point on the closing argument front, apart from the threshold point that review is for plain error, is that we have a case from 1987 called Garcia out of the First Circuit which seems to endorse I'm sorry. Do you want us to bless prosecutors in closing using the term liar? Yes, we do. The vast majority of circuits hold that way. You held an opinion that you authored in Obershaw came out the exact same way. A prosecutor in that case, a 2006 decision of the First Circuit that you authored, said exactly that, that the defendant was lying to the police and lying in his testimony. And your point in that decision was to say, look, so long as this was not the personal opinion of the prosecutor, those words were not improper. And Garcia in 87 says the same thing. So you have the alpha and omega of First Circuit case law on this point. Garcia in 87. Obershaw in 2006. You have decisions in the middle, Rodriguez, Estrada, and Mickens, that seemingly come out the other way. We have a mixed message being sent by the court. And the case law in other circuits overwhelmingly, with the exception of the Fourth Circuit, says that prosecutors can refer to defense testimony as lies, liar, however you want to put it. So there can't be a frame here. Did the cases condition that on the presence of evidence of changed stories? Oh, certainly. And in Obershaw, that's exactly what you did. But here there was a rich, wealth source of evidence showing that Mosley and Saad had lied in their testimony. I won't even bother rehearsing it now because the brief covers it in detail. But remember, this is a guy who comes up with three different alibi stories, admits that the first two are completely concocted, and that's a third one for the jury, which is just completely mind-boggling on its face. And there are other false statements as well. And we detail this all in the brief. So the prosecutor clearly had a very fond basis for using the words. It was not his personal opinion, and that's the null of it. And the third and fourth prongs of the plain error test could not be satisfied anyway. I know you're over, but I wanted to ask one follow-up question on the harmless error issue. If I understand the defense counsel's argument, it's that Murphy was filling a gap that Hartman... Reins. Reins, yeah. Reins was filling a gap. Hartman was filling a gap that... I know exactly where you're heading. So there's a mysterious gap... What do you make of that argument, whatever it is? Okay, so in the reply brief in particular, you see this sort of mysterious gap theory, I'll call it. And the fact is the record says almost nothing about this supposed gap. Where they're getting the gap theory primarily from is one very small snippet from Paul Manning's testimony. Paul Manning was not even a guy with electrical experience. He was one of the guys who was doing evidence collection at the scene. And Manning makes a remark along the lines of, on a certain day of the investigation, the three-day investigation of the electrical issues, he says something like Murphy had completed it to the best of his whatever ability or something like that. The defense latches on that and says, aha, there's a gap in his knowledge. But there's nothing in the record about what that gap is, the extent of the gap at all. What we do know, and this is crucial, is that from Murphy's testimony, he says that Reins accompanied him as they looked at one of the three service panels. Remember, there's this whole arc mapping analysis they do from the three service panels. Just with respect to one of those panels, Reins comes along with Murphy and they do it together. And Murphy says that Reins played a leading role with respect to that panel. Now, they're clear that they're doing this collaboratively. He clearly, Murphy, has the ability to testify concerning the arc mapping that they did of that. The fact that Reins may have played a leading role with respect to that panel doesn't create a gap. Just imagine if you have a drug exam being done by two chemists, a senior chemist and a mid-level chemist. They both look at cocaine to analyze the cocaine. They're working their cheek by jowl together. And the senior guy is providing some insights which clarify things for the mid-level guy. The mid-level guy is the one who testifies. Do we have to call the senior guy just because he played a lead role or because he offered some clarifying insights to the mid-level guy? We would submit no. And so the mysterious gap remains a gap and we think it's insignificant. Thank you. A few brief responses to the government's argument. First, the yeses, well, there may be multiple readings that can come from that. But given that it's a constitutional violation, Mr. Stout is entitled to the benefit of that ambiguity. Moreover, I point this court to Agent Hartman's own report in which he solely credits Mr. Reins with making a conclusion as to the electrical cause of the fire. That's at A118 paragraph 48. So there is a testimony that Agent, I mean, Officer Manning offered was that as of December 1st before Mr. Reins came on board, Investigator Murphy had concluded the investigation to the extent his expertise allowed. That is not some sort of ambiguous statement. It showed that why wouldn't it make sense on a case like this to require there to be an objection after the yes answer when there is an ambiguity? Because if the outcome of the sidebar is that the government reasonably might have thought it was asking a question that would avoid bringing in Reins, and then you reasonably think as the defense counsel, I think that answer is going to actually have brought in Reins, that the right thing to do would be, since the judge seemed to not want Reins in, the right thing to do would then be to object separately, saying, well, that answer does bring in Reins, and then the judge could rule on it instead of saying nothing, having no limiting instruction or anything, no chance to have an issue about that. So any objection at that point would have been futile. The ruling from the district court was that if it's in Mr. Reins' report, it can come in. And so to the extent that those two yeses, as we contend, were a parroting of Mr. Reins' conclusion, it is encompassed by the district court's ruling, and therefore any additional objection by Mr. Saad would have been futile at that point. So you would regard it the opposite way, the very fact the district court said that, that it has to be from the Reins' report makes the yes more likely to be about Reins. That's correct, Judge Barron. If I can take a few moments to just address some of the prosecutorial misconduct statements. You can have 30 seconds. Thank you, Judge Lynch. I would point out that Rodriguez-Estrada and Nickens were clear that you cannot convey a personal opinion about the truth or falsity of a witness's testimony, and you cannot call the defendant or defense witnesses liars. And that is exactly what the prosecutor did over and over in this case and to material aspects of Mr. Saad's defense, including his alibi. For those reasons, Your Honors, we would request that the conviction be reversed. Thank you. Thank you both.